927 F.2d 597
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Donald A. FLAX, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas R. MCCLARY, a/k/a BooBoo, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Andre D. MINOR, Defendant-Appellant.
 Nos. 90-5659 to 90-5661.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 9, 1991.
Decided March 4, 1991.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Richmond. James R. Spencer, District Judge. (CR-89-82-3-R)
 John E. Lichtenstein, Bremner, Baber & Janus, Richmond, Va., argued for appellant Flax;
 Michael Morchower, Morchower, Luxton & Whaley, Richmond, Va., argued for appellant McClary; Lauren Adler, Morchower, Luxton & Whaley, Richmond, Va., on brief.
 Sa'ad El-Amin, Richmond, Va., argued for appellant Minor.
 Stephen Wiley Miller Assistant United States Attorney, Richmond, Va., for appellee; Henry E. Hudson, United States Attorney, N. George Metcalf, Assistant United States Attorney, Richmond, Va., on brief.
 E.D.Va.
 AFFIRMED.
 Before K.K. HALL and WILKINS, Circuit Judges, and COPENHAVER, United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Donald Flax, Thomas McClary, and Andre Minor appeal their convictions after a jury trial of conspiracy to possess cocaine with intent to deliver. Flax also appeals his conviction of unlawful use of an interstate communication facility, and defendant McClary appeals his conviction of possession of a firearm during commission of a felony. We find no error, and therefore affirm.
 
 I.
 
 2
 In October 1989, appellant Donald Flax was awaiting trial on a charge unrelated to this case in the Henrico County, Virginia, jail. He met an Israeli native, Moshe Pinto, who was awaiting trial on cocaine distribution charges. The two had known each other briefly some years before. Flax had not been assigned a cell in the overcrowded jail, and Pinto invited him to bring his mattress to Pinto's cell where he would have some degree of privacy. Flax accepted.
 
 
 3
 Flax was interested in Pinto's distribution of cocaine. He explained that he had been distributing cocaine himself, and was seeking a cheaper supplier. Pinto told Flax that he had a source in New York who would sell cocaine for $12,000 to $15,000 per kilogram. Because this price was barely half the current market price, Flax expressed interest in setting up a multi-kilogram deal with Pinto's source.
 
 
 4
 In fact, Pinto had no such source, and the bargain price he quoted Flax resulted from his ignorance of the wholesale cocaine market.[1] He contacted his lawyer, who advised him to tell Henrico County police about Flax's solicitation. The next day he did so. The investigating officers saw a chance to set up a sting by posing as Pinto's source. They advised Pinto to keep notes of his future conversations with Flax. He followed the officers' instructions, and kept the notes in his native Hebrew so that other inmates could not read them. Though Pinto hoped that his cooperation would help him gain leniency in his own prosecution, the government did not promise a reward.
 
 
 5
 Flax expected to be released on bond, and intended to make the contact with Pinto's source himself. He gave Pinto several telephone numbers--his home, office, mother's house, car, girlfriend's, and a residence he owned on Hull Street where he had conducted previous deals. Under Flax's initial scenario, Pinto's source would contact him at one of these phone numbers.
 
 
 6
 Flax instructed Pinto that the source should call himself "a friend of Moshe's," and that cocaine should be referred to as "gravel." Flax explained that the latter code word was a precaution in case authorities were listening, and was a particularly good cover because Flax and a business partner (appellant Thomas "Boo Boo" McClary) actually operated a legitimate gravel-hauling business.
 
 
 7
 Flax wanted to purchase five kilograms, but could not raise the money. Eventually, he agreed to buy two kilograms for $15,000 each. In mid-November, however, he was convicted of the pending charges; consequently, he was not released from jail. Undaunted, Flax made plans to have some associates complete the transaction.
 
 
 8
 Flax told Pinto that "Greg" or "Boo Boo" would handle the deal. He gave Pinto more telephone numbers: Boo Boo's pager (which proved to be listed in Flax's name) and home number. When Pinto's source called Greg or Boo Boo, he was supposed to identify himself as "a friend of Donnie's" and use the code word "gravel."
 
 
 9
 To provide a sure link between Flax and the other conspirators, the police injected their own code word into the transaction. They had Pinto instruct Flax that Flax's representative should identify himself as "Pinocchio" when Pinto's source called.
 
 
 10
 On the evening of December 6, a DEA agent, posing as the cocaine source, called a phone number Flax had given Pinto. The number was located at the Hull Street residence and was registered to Flax. The agent said he was a "friend of Donnie's" who wanted some "gravel" for his driveway. The person who had answered the phone immediately identified himself as "Pinocchio." The agent instructed "Pinocchio" to call back at another number. This tactic was designed to enhance the agent's credibility, because telephone "switching" is a common practice among cocaine traffickers.
 
 
 11
 "Pinocchio" called back twenty minutes later. The agent asked if he was speaking to Greg or Boo Boo; the caller replied that he was Greg. The two then made their plans. Greg and the agent's representative would meet the next day at Richmond International Airport to make further arrangements for the transaction--two kilograms of cocaine at $15,000 each. The agent had initially proposed that the transaction itself take place at the airport, but Greg was concerned about the police presence there. Both of these telephone calls were recorded.
 
 
 12
 The second conversation ended at 7:02 p.m. At 7:30, Flax made a collect phone call from the Henrico County Jail to the Hull Street phone number. At 7:57, Pinto called investigators to report that Flax's representative was concerned about meeting at the airport. Pinto and the investigators later testified that Pinto had not known the proposed meeting place until Flax told it to him. Hence, the chain of conspiracy was highlighted once again.
 
 
 13
 At 1:30 p.m. the next day, Greg, whose full name was Greg Staples, and Dwayne Swann arrived at the airport. Swann remained outside in Staples' truck, while Staples went inside. A DEA agent was waiting at the airport bar, and a hidden camera videotaped the scene. Staples approached the agent, and made the prearranged opening to the conversation: "You got change for a hundred?" The agent replied, "Donnie's friend sent me," and the two proceeded to make the deal.
 
 
 14
 Staples said that he only had $28,000 of the money; the agent agreed to make the sale anyway, and said he would collect the other two thousand when the two dealt again. Staples again expressed his concern about the airport. The agent agreed to go somewhere else to make the exchange, but insisted that he see the buy money first.
 
 
 15
 The agent actually had no cocaine. The arrest was timed to occur as soon as the conspirators showed him the money. The agent had been instructed to tie a pink scarf around his neck as an arrest signal.
 
 
 16
 Staples said he did not have the money on him, but that some associates were holding it. He agreed to return to the airport with the money. Staples left in his truck with Swann.
 
 
 17
 At 2:35 p.m., Staples and Swann returned, followed closely by a white Saab driven by appellant Thomas "Boo Boo" McClary. In the front passenger seat was appellant Andre Minor. The two vehicles pulled up to the DEA agent, who was waiting on the curb in front of the airport. Staples instructed him to look in the Saab for the money.
 
 
 18
 The agent looked into the Saab through the driver's side window and saw a gun case on Minor's lap. Without a word passing among them, Minor opened a bag and showed the agent $26,680 in $20 and $100 bills. Neither McClary nor Minor changed expression when they flashed the money.
 
 
 19
 The agent gave the arrest signal and got out of the way--he and Swann went inside the airport, purportedly to get the cocaine. Swann was arrested inside. Agents closed in on the vehicles. In an attempt to escape, McClary drove the Saab across several lanes of traffic, but was stopped by police cars in front and behind him. McClary and Minor were arrested.
 
 
 20
 Staples slammed his truck into reverse and drove over a median strip; an officer shot and killed him.
 
 
 21
 In searching McClary, the officers found a Glock 9mm. semi-automatic pistol tucked into his pants. The gun was fully loaded with a 16-bullet clip, and one round was in the chamber ready to be fired. McClary also had a spare clip of 16 hollow-point rounds and the pager Flax had told Pinto that Boo Boo carried; the pager was registered in Flax's name.
 
 
 22
 Inside the Saab, officers retrieved the bag containing $26,680 in currency. Beneath the bag was a .44 revolver. Purchase receipts in McClary's wallet revealed that McClary had bought both guns.
 
 
 23
 Minor, who had flashed the money to the DEA agent, was, according to his own testimony, a close friend of Staples, and the two lived together at Flax's Hull Street residence.
 
 
 24
 Flax, McClary, Minor, and Swann were named in a five count indictment. Count One charged all four with conspiracy to possess with the intent to distribute two kilograms of cocaine. Counts Two and Three charged McClary and Minor respectively with carrying and using a firearm during and in relation to the drug conspiracy. Count Four charged Flax with aiding and abetting the use of a telephone to further a drug conspiracy. Finally, Count Five charged Swann with simple possession of marijuana and heroin; small quantities of each were discovered on him at the time of his arrest.
 
 
 25
 After a four-day trial in March 1990, a jury returned guilty verdicts against all defendants on all counts, except Swann on Count One (conspiracy) and Minor on Count Three (firearm possession).
 
 
 26
 On May 9, 1990, the district court sentenced Flax to 236 months for conspiracy and a concurrent 48 months for aiding and abetting use of the telephone to further the drug conspiracy. He was also fined $20,000. McClary received 108 months for conspiracy, a mandatory consecutive 5 years for carrying a firearm, and a fine of $5,500. Minor was sentenced to 108 months for conspiracy, but was not fined. Swann received 12 months for his simple possession conviction.
 
 II.
 
 27
 Appellants challenge the sufficiency of the evidence against them. In weighing this challenge, the evidence, and all reasonable inferences arising from it, must be viewed in the light most favorable to the government. Jackson v. Virginia, 443 U.S. 307 (1979).
 
 
 28
 Pinto was a key government witness, and the essence of Flax's argument is that Pinto was so unworthy of belief that there is a reasonable doubt as to his guilt as a matter of law. He argues that Pinto is a crook who had his own neck on the line and who would do and say anything to save it. He suggests that, in order to frame him, Pinto rifled his belongings, found the various phone numbers, and set up the whole deal. It is hard to give this story any credence. We strongly doubt that Pinto, a total stranger, could call up Flax's comrades from jail at phone numbers chosen at random from Flax's belongings, convince the recipients of the calls to trust him, and orchestrate the whole drug deal.
 
 
 29
 As to his attacks on Pinto's credibility, the government makes a tried and true argument: Flax attacked Pinto's credibility at trial, but the jury chose to believe the testimony. The jury's choice was one a reasonable mind could make, so we must affirm it.
 
 
 30
 McClary and Minor's story also rings hollow. They allege that they came to the airport to help Staples buy some jewelry, not drugs. They point their fingers at the dead Staples as having pulled them into the cocaine transaction without their knowledge. They do not explain why this supposed jewelry deal required hollow-point bullets and semi-automatic weapons. In any event, they told their story to the jury, and again the jury simply did not believe it.
 
 III.
 
 31
 At trial, Minor called a witness to the stand to relate conversations the witness had had with Staples concerning Staples' desire to get into the jewelry business. The district court sustained the government's hearsay objection.
 
 
 32
 Now Minor argues that the court's ruling was erroneous because the deceased Staples was clearly "unavailable" within the meaning of Fed.R.Evid. 804(a)(4). The government does not dispute that death is the ultimate unavailability, but points out that Rule 804(a)(4) is not in and of itself a hearsay exception. It is instead a preliminary showing required before consideration of the Rule 804(b) hearsay exceptions. None of the enumerated 804(b) exceptions (former testimony, dying declaration, statement against interest, or statement of family background) comes anywhere near permitting introduction of a hearsay declaration that Staples wanted to buy jewelry.[2]
 
 
 33
 The judgments are affirmed.
 
 AFFIRMED
 
 
 [1]
 Pinto dealt in ounce, rather than kilogram, quantities of cocaine
 
 
 [2]
 Belatedly, Minor asserted at oral argument that the proffered hearsay should have been admitted under the residual hearsay exception of Rule 804(b)(5). This provision has a narrow purpose: to leave room for the law to develop beyond the historical experience available to the drafters of the rules of evidence. It is not a license for unrestrained admission of hearsay, as is evidenced by its admonition that it only be used where the hearsay and the enumerated exceptions bear "equivalent circumstantial guarantees of trustworthiness." In addition to this showing, rigorous other procedural and substantive requirements are imposed by the rule, including advance notice of intent to offer the hearsay, all of which Minor falls far short of satisfying